IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| AEGIS SECURITY INSURANCE COMPANY, | ) ) ) | |
| Plaintiff/ Counterclaim Defendant, | ) ) ) | |
| v. | ) ) | CIVIL ACT. NO.  1:23-cv-374-TFM-C |
| MW INDUSTRIAL SERVICES, INC., | ) ) ) | |
| Defendant/ Counterclaim Plaintiff/ Third-Party Plaintiff, | ) ) ) ) | |
| v. | ) ) | |
| MAHORSKY GROUP, INC., *et al.*, | ) ) | |
| Third-Party Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is the *Motion for Preliminary Injunction and for Specific Performance of Agreements of Indemnity for Deposit of Collateral by MWIS* (Doc. 124, filed March 28, 2025) in which Plaintiff Aegis Security Insurance Company motions the Court, pursuant to Fed. R. Civ. P. 65, to issue a preliminary injunction that requires Defendant MW Industrial Services, Inc. to perform certain contractual obligations, pursuant to indemnity agreements that Defendant executed.  Specifically, the injunction moves the Court to require Defendant deposit with the Clerk of Court $3,306,311.00 as collateral until judgment is entered as to the issues of validity and enforceability of the indemnity agreements in this matter. *Id.*  Further, Plaintiff moves, that before the requested collateral is deposited with the Clerk of Court, Defendant be enjoined from making asset transfers or encumbering assets and be required to issue a verified accounting

of its assets. *Id.* Having considered the motion, response, reply, and the evidence and argument that was presented at the hearing, the Court **GRANTS in part and DENIES in part** the motion.

## I.      JURISDICTION AND VENUE

The Court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332 (diversity).

The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both. The district court has personal jurisdiction over the claims in this action because the events that gave rise to this action are alleged to have occurred within this judicial district. See Consol. Dev. Corp. v. Sherritt, Inc., 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint . . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated. The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state.").

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions that gave rise to this litigation occurred in this judicial district.

## II.      BACKGROUND

### A.      Factual Background

Cueto Consulting & Construction LLC ("Cueto") is a Texas contractor that was awarded two contracts from the Army Corps of Engineers ("the Corps"). Doc. 78 at 12. Pursuant to the first contract, Cueto was required to construct a building for the Corps near the Granger Lake reservoir, which is located outside of Austin, Texas ("the Granger Lake Project"). *Id.* Pursuant to

the second contract, Cueto was to complete certain work at the Fort Hood Military Base ("the Fort Hood Project") (collectively, the Granger Lake Project and the Fort Hood Project will be referred to as "the Projects"). *Id.* The Corps awarded Cueto the contracts for the Projects on September 27, 2019. *Id.*

As part of Cueto's work for the federal government, it was required to procure construction bonds, including bid bonds, performance bonds, and payment bonds. *Id.* at 13. Cueto did not have the financial ability to secure the appropriate bonds for the Projects and had ten days from the date when the contracts for the Projects were awarded to secure the required bonds. *Id.* Third-Party Defendant the Mahorsky Group, Inc. ("MGI") was Cueto's surety bonding agency and Defendants Jesse Bingaman ("Bingaman") and Scott Mahorsky ("Mahorsky") (collectively, MGI, Bingaman, and Mahorsky will be referred to as "the Mahorsky Parties") were Cueto's bonding agents and brokers. *Id.* Together, the Mahorsky Parties and Plaintiff/Counterclaim Defendant Aegis Security Insurance Company ("Aegis") sought an indemnitor for Cueto. *Id.* at 14. The Mahorsky Parties acted as Aegis's agents under a Surety Agent Agreement that authorized MGI to solicit proposals for indemnitors for bonds that were issued by Aegis. *Id.* Under the arrangement between Aegis and the Mahorsky Parties, Aegis would collect the premiums on the bonds and the Mahorsky Parties would be paid by Aegis a commission for selling the bonds. *Id.*

On June 26, 2019, Bingaman, at Mahorsky's direction, approached MWIS to act as a cross-indemnitor for Cueto after other potential cross-indemnitors declined. *Id.* At the time, MWIS was an existing client of MGI – MWIS had used Mahorsky and MGI to secure bonds for MWIS's projects, including bonds from Aegis. *Id.* at 14.

Beginning in June 2019 and continuing through October 2019, the Mahorsky Parties communicated with MWIS's agents, including Jay Dollar ("Dollar") and Jim Landers ("Landers),

Page 3 of 32

to indemnify Cueto's bonds. *Id.* at 15. At the time, MWIS had not been a party to an indemnity agreement for another party, and neither Dollar, Landers, nor MWIS's owner, Tiffanie Jones ("Jones"), had much knowledge of, or experience with, cross-indemnity agreements. *Id.* MWIS had no pre-existing relationship with Cueto nor knowledge of Cueto's financial state or experience. *Id.* at 16. Nor did MWIS, at the time, have experience with contracting work for the federal government and had not been pre-approved to serve as a federal contractor, while the Mahorsky Parties had experience with federal contracting work and Aegis had experience in writing bonds for federal projects. *Id.*

To convince MWIS to act as an indemnitor to Cueto, Bingaman and Mahorsky represented to MWIS that MGI and/or Third-Party Defendant Brick Procurement, Inc. n/k/a Risk Strategies, Inc. ("Brick Procurement"), would perform funds control for the Projects and Brick Procurement would perform project monitoring for MWIS. *Id.* at 17. Bingaman and Mahorsky also told MWIS that MGI would ensure MWIS would receive a separate teaming agreement with Cueto whereby, if Cueto was unable to complete the Projects, MWIS would have the first right to complete the Projects at a higher rate of pay than what Cueto was to receive. Mahorsky represented to MWIS the indemnity agreements would not obligate MWIS to any bond or monetary obligation and MWIS would receive financial compensation from Cueto if it agreed to serve as an indemnitor for the Projects. *Id.* at 18. On October 24, 2019, Jones executed the agreements of indemnity for the Projects ("the Agreements"). *Id.*

Within a few months of Cueto's work on the Projects, Cueto's subcontractors asserted claims against the Fort Hood Project bonds because of nonpayment. *Id.* at 20. In January 2020, the Corps sent Cueto a notice of deficiency for the Fort Hood Project that listed several problems with Cueto's management of the project. *Id.* In February 2020, the Corps issued to Cueto a stop

work order for the Fort Hood Project, and a few months later, terminated the project. *Id.*

For the Granger Lake Project, Cueto used plans that contained design flaws that resulted in the structural insufficiency of the final build. *Id.* at 20-21. Cueto also found it difficult to secure subcontractors for the Granger Lake Project due to the site's remote location. *Id.* at 21.

Neither the Mahorsky parties nor Aegis disclosed to MWIS the complications for Cueto and with the Projects. *Id.* After Cueto defaulted, Mahorsky, MGI, and Brick Procurement hired a project manager at their own expense to help complete the Granger Lake project and Aegis hired a contractor to implement a plan to complete the Projects. *Id.* at 21-22.

Both the Mahorsky Parties and Aegis knew of Cueto's financial problems and undercapitalization before the Projects began but did not disclose that information to MWIS. *Id.* at 22.

In June 2022, MWIS received from Aegis a demand letter for indemnity. *Id.* Landers then called Mahorsky, who assured Landers that everything was fine with the Projects and he was taking care of it with his own project manager on site. *Id.*

**B.    Procedural Background**

On March 28, 2025, almost two (2) years after this litigation began, Aegis filed its instant motion for preliminary injunction and specific performance (Doc. 124) for which the Court entered a briefing schedule (Doc. 125). Defendant filed its response (Doc. 133), and Plaintiff timely filed its reply (Doc. 144). The Court set the matter for a hearing that was convened on June 26, 2025 (Doc. 149; *see* Docs. 153, 154). At the hearing appeared Luther Graves Stiff, III, and Weathers Bolt for Aegis, Charles Alan Burkhart and Robert Vance Baxley for MWIS, and Royal Clay Dumas for the Mahorsky Parties. The Court heard argument, after the hearing, the Court instructed the parties to submit supplemental briefs  The motion is, now, ripe for the Court's review.

### III.   STANDARD OF REVIEW

Though this case involves both questions of state and federal law, whether or not to grant or deny a preliminary injunction is reviewed under the auspices of federal law. *See Ferrerro v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1448 (11th Cir. 1991); *see also Mitsubishi Intern. Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1525 (11th Cir. 1994) (citing *Ferrerro* and stating, "[u]nder Fed. R. Civ. P. 65, federal law, rather than [state] law, governs the grant of a preliminary injunction to preserve the relative positions of the parties until a trial on the merits can be held").

"The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)).  The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (citations omitted).  The party seeking the preliminary injunction bears the burden of establishing its entitlement to relief. *Scott v. Roberts*, 612 F.3d 1279, 1289 (11th Cir. 2010).

To obtain a preliminary injunction, the moving party must establish the following prerequisites: "(1) a substantial likelihood of success on the merits; (2) that it will suffer irreparable injury unless the injunction is issued; (3) that the threatened injury outweighs possible harm that the injunction may cause the opposing party; and (4) that the injunction would not disserve the public interest." *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015) (citing *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1262-63 (11th Cir. 2004); *see also Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (stating same four requirements).  "[A] preliminary injunction is an extraordinary and drastic remedy that

should not be granted unless the movant clearly carries its burden of persuasion on each of these prerequisites." *GeorgiaCarry.Org*, 788 F.3d at 1322 (quoting *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir. 2001)); *accord Café 207, Inc. v. St. Johns Cnty.*, 989 F.2d 1136, 1137 (11th Cir. 1993) ("A preliminary injunction is a drastic remedy and [the movant] bears the burden to clearly establish each of the four prerequisites."); *see also Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 179 (5th Cir. 1975) ("[G]ranting a preliminary injunction is the exception rather than the rule" and movant must clearly carry the burden of persuasion.). The moving party's failure to demonstrate a single element may defeat the request regardless of the party's ability to establish any of the other elements. *See, e.g., Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (failure to show irreparable injury); *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) (failure to establish substantial likelihood of success on the merits).

## IV.    DISCUSSION AND ANALYSIS

Aegis argues it has no adequate remedy at law, has a substantial likelihood of success on the merits, and will suffer irreparable harm based on the language of "Section 3(b)" of the indemnity agreements that Jones signed. Doc. 124 at 7-8. Aegis argues case law supports the proposition that a money judgment is not an adequate remedy to enforce a surety's right to be collateralized against its indemnity obligation. *Id.* at 7. Aegis argues MWIS would not be prejudiced or harmed if it were to be ordered to deposit the collateral with the Court because it would be preserved until the Court disposed of the claims in this matter. *Id.* at 8. Finally, Aegis argues its requested injunction is in the public's interest to enforce contracts and maintain the solvency of surety companies that support construction projects. *Id.* at 9.

In response, MWIS argues Aegis has not shown it will suffer immediate and irreparable injury because Aegis has delayed for years to seek its requested injunction and its alleged harm

suffered can be adequately remedied by monetary damages. Doc. 133 at 22-23. As to immediacy, MWIS argues Aegis began to receive notices from sub-contractors of potential claims on the relevant bonds as early as 2020, Aegis did not demand of MWIS collateral in the amount of $3,000,000 until June 20, 2022, Aegis did not file this instant action until April 27, 2023, and did not make its instant request for a preliminary injunction until March 28, 2025. *Id.* at 24-25. As to irreparability, MWIS argues the bonded construction projects are complete, new claims on the bonds cannot arise that would require collateral, the claims on the bonds have been reduced to a definite amount, and MWIS is neither insolvent nor secreting assets. *Id.* at 27. MWIS also argues Aegis is no longer in the surety business. *Id.* Additionally, MWIS argues Aegis is unlikely to succeed on the merits of its claims in this matter because evidence supports MWIS's counterclaim that the indemnity agreements were induced by fraud that was committed by Aegis's agent, the Mahorsky Parties, and there is no, or a total failure of, consideration to support the indemnity agreements. *Id.* at 28-43. Finally, MWIS argues the balance of harms and the public interest weigh against an injunction in this matter because, if MWIS were ordered to deposit Aegis's requested amount with the Court, MWIS's operations would be strained, it would risk default on current contracts, jeopardize its continued viability, and Aegis is no longer in the surety business. *Id.* at 43.

In reply, Aegis argues MWIS waived any claims of defenses to Aegis's instant request for an injunction based on the Section 3(b) of the indemnity agreements, Aegis has a right of specific performance to secure collateralization of its right to indemnification under Alabama law, and any misrepresentations by the Mahorsky Parties to MWIS were outside the scope of the operable surety agency agreement between Aegis and the Mahorsky Parties. Doc. 144 at 4-11. Aegis argues, even if Aegis is bound by the Mahorsky Parties' alleged misrepresentations, the misrepresentations were

not of any material existing facts and MWIS's reliance on the alleged misrepresentations was unreasonable. *Id.* at 11-14.

The Court will address in turn the elements for a preliminary injunction.

**1.       Substantial Likelihood of Success on the Merits**

For a claim for specific performance of a contract to succeed, the loss from the breach of the contract must not be fully compensable by a remedy at law. *Grayson v. Boyette*, 451 So. 2d 798, 800 (Ala. 1984) ("Ordinarily, a court will not order specific performance of a contract relating to personalty, because there is an adequate remedy at law. . . . If, however, the loss occasioned by the breach cannot be fully compensated for in an action at law, specific performance will be granted." (citation and internal citation omitted)).  "Case law nationwide has recognized the right of a surety to use the equitable remedy of specific enforcement to secure collateralization of its right to indemnification of the principal's debt." *Auto-Owners Ins. v. Randy B. Terry, Inc.*, Civ. Act. No. 5:12-CV-02717-TMP, 2013 U.S. Dist. LEXIS 176903, at *14, 2013 WL 6583959, at *6 (N.D. Ala. Dec. 16, 2013) (Proctor, J.) (adopting report and recommendation); *see also Ala. Bank & Tr. Co. v. Garner*, 142 So. 568 (Ala. 1932) ("No principle is more familiar, or more firmly established, than that a surety, after the debt for which he is liable has become due, without paying or being called on to pay it, may file a bill in equity in the nature of a bill quia timet to compel the principal debtor to exonerate him from liability by its payment, provided no rights of the creditor are prejudiced thereby.  And in order to maintain such bill it is not necessary for the surety to show any fraudulent disposition of property on the party of the principal or any special reason for fearing a loss.  When a surety comes into a court of equity to compel the principal to pay the debt, he stands in the position of an equitable assignee and may use the remedies of the creditor at his own risk and cost." (emphasis omitted) (citations omitted)).

Aegis argues Jones confirmed in her deposition that she executed the indemnity agreements. Doc. 124 at 5; *see* Doc. 124-1 at 9, Doc. 124-2 at 9. In response, MWIS attacks the validity of the contracts based on its arguments that MWIS was fraudulently induced to enter into the agreements and there was no consideration to support an enforceable agreement. Doc. 133 at 28-43. The Court will address the fraudulent inducement and consideration arguments in turn.

### a.      Fraudulent Inducement

MWIS argues its affirmative defense of fraud is based on claims for fraudulent misrepresentation and fraudulent suppression by the Mahorsky Parties, who MWIS argues were Aegis' agents. Doc. 133 at 28-38. MWIS argues the Mahorsky Parties repeatedly misrepresented to MWIS the risks, protections, and obligations under the indemnity agreements, including there was no risk associated with the particular indemnity agreements, the Mahorsky Parties would perform funds control and project monitoring that would protect MWIS from liability and identify issues with Cueto, MWIS would have the first right to complete the projects if Cueto defaulted with no financial obligation under the bonds, a five percent (5%) fee, and a teaming agreement, all of which turned out to not be true. *Id.* at 29-30. MWIS argues the Mahorsky Parties misrepresented Cueto as a promising, reliable contractor, who needed support to be bonded, and the Mahorsky Parties did not disclose Cueto's poor financials or a recent $340,000 claim against Cueto on another Aegis bond and Cueto's principals were behind on personal loans. *Id.* at 30. MWIS argues the Mahorsky Parties misled Aegis when they represented MWIS had prior experience on federal projects and in indemnity roles. *Id.*

As to a special relationship between MWIS and the Mahorsky Parties, MWIS argues it placed specific trust and confidence in the Mahorsky Parties as the subject matter experts of bonding, indemnity, and surety, and believed the Mahorsky Parties were looking out for its best

interest.  *Id.* at 31.  MWIS argues it relied on the Mahorsky Parties for advice and counsel to understand the indemnity agreements.  *Id.*  MWIS argues, if it knew about Cueto's financial condition, it would not have executed the indemnity agreements.  *Id.* at 32.  MWIS argues a disparity of knowledge between it and the Mahorsky Parties, who were experts in matters of surety, bonding, and federal contracting and were privy to information about Cueto's financial condition that MWIS was not, such that the Mahorsky Parties had a duty to disclose that information.  *Id.* at 32-33.

As to whether Aegis is responsible for the Mahorsky Parties' conduct, MWIS argues the Mahorsky Parties acted within the line and scope of their agency agreement with Aegis when the secured the indemnity agreements at issue.  *Id.* at 34-35.

MWIS argues the duty to read does not apply where there is a special or confidential relationship between the parties, and it could rely on oral statements from the Mahorsky Parties because of the special relationship between them.  *Id.* at 35-36.  MWIS argues the duty to read only applies when oral statement are explicitly and clearly contradicted by the language of the contract but the indemnity agreements do not contract the Mahorsky Parties' misrepresentations. *Id.* at 36-38.

In response, the Mahorsky Parties argue MWIS could not have reasonably relied on any of the alleged statements that there would be no liability if it executed the indemnity agreements because the indemnity agreements that Jones signed expressly state the circumstances under which MWIS would be liable for damages and would assume responsibility for such.  Doc. 176 at 15-19. The Mahorsky Parties argue Jones admits she read the indemnity agreements and, if she did not understand the terms of such, she could have consulted with counsel, which the agreements advised she do.  *Id.* at 17-18.  The Mahorsky Parties argue there was not a special relationship

between them and MWIS such that MWIS would be excused from reading the terms of the indemnity agreements, and the limited circumstances presented and advocated by MWIS, in *Potter v. First Real Estate Co.*, 844 So. 2d 540, 550 (Ala. 2002), do not apply here. *Id.* at 19-26. The Mahorsky Parties argue they did not owe MWIS a fiduciary duty and such a duty was not created because the Mahorsky Parties were more knowledgeable of the subject matter. *Id.* at 21-24. Further, the Mahorsky Parties argue MWIS' fraudulent misrepresentation claim is barred by the applicable statute of limitations. *Id.* at 26.

As to the alleged oral promise to provide a teaming agreement, the Mahorsky Parties argue MWIS failed to plead promissory fraud, and even if it did, the claim fails as a matter of law. *Id.* at 27. The Mahorsky Parties argue Dollar was responsible for negotiating the terms of a teaming agreement with Cueto and any agreement would need to be negotiated between MWIS and Cueto. *Id.* at 29-33. Additionally, the Mahorsky Parties argue MWIS' unpled promissory fraud claim is barred by the applicable statute of limitations. *Id.* at 35-37.

As to the alleged fraudulent misrepresentation that funds control would occur for the projects, the Mahorsky Parties argue there were funds control for the projects but the use of such did not completely eliminate the risk of loss and only ensured timely payments. *Id.* at 36-38.

As to the alleged fraudulent misrepresentation that Brick Procurement would perform project monitoring for MWIS, the Mahorsky Parties argue Brick Procurement performed project monitoring and MWIS chose not to participate in the relevant meetings after a certain point in time to receive updates on the projects. *Id.* at 39-40.

As to the alleged fraudulent suppression of Cueto's financial situation, the Mahorsky Parties argue they were not obligated to provide such information to MWIS because they did not owe MWIS a fiduciary duty and MWIS knew Cueto could not be bonded on its own for the projects

and required MWIS to qualify for a bond. *Id.* at 40-41. The Mahorsky Parties argue MWIS failed

to perform its due diligence of Cueto before it executed the indemnity agreements and, in any case,

is barred by the applicable statute of limitations. *Id.* at 40-42.

> The elements of fraudulent misrepresentation are: "'(1) [a] false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation. *Earnest v. Pritchett–Moore, Inc.*, 401 So. 2d 752 (Ala. 1981).'" *Pranzo v. ITEC, Inc.*, 521 So. 2d 983, 984 (Ala. 1988) (quoting *Coastal Concrete Co. v. Patterson*, 503 So. 2d 824, 826 (Ala.1987)). When, as in this case, "'fraud is based upon a promise to perform or abstain from performing in the future, two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive. *Clanton v. Bains Oil Co.*, 417 So. 2d 149 (Ala. 1982).'" *Pranzo*, 521 So. 2d at 983 (quoting *Coastal Concrete*, 503 So. 2d at 826).

> The elements of fraudulent suppression are: "(1) the defendant had a duty to disclose an existing material fact; (2) the defendant concealed or suppressed that material fact; (3) the defendant's suppression induced the plaintiff to act or refrain from acting; and (4) the plaintiff suffered actual damage as a proximate result. *Freightliner, LLC v. Whatley Contract Carriers, LLC*, 932 So. 2d 883, 891 (Ala. 2005)." *Coilplus–Alabama, Inc. v. Vann*, 53 So. 3d 898, 909 (Ala. 2010). "'[A]n action for suppression will lie only if the defendant actually knows the fact alleged to be suppressed.'" *Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 726 (Ala. 2009) (quoting *McGarry v. Flournoy*, 624 So. 2d 1359, 1362 (Ala

*Ala. Psychiatric Servs., P.C. v. 412 S. Ct. St., LLC*, 81 So. 3d 1239, 1247 (Ala. 2011).

> A misrepresentation amounts to fraud when "'one party[ ] misrepresent[ed] a material fact concerning the subject matter of the underlying transaction and the other party[ ] rel[ied] on the misrepresentation to his, her, or its detriment in executing a document or taking a course of action.'" *Johnson Mobile Homes of Alabama, Inc. v. Hathcock*, 855 So. 2d 1064, 1067 (Ala. 2003) (quoting *Oakwood Mobile Homes, Inc. v. Barger*, 773 So. 2d 454, 459 (Ala. 2000)) (emphasis omitted). However, it is not enough for the party claiming fraud to simply show that there was a misrepresentation upon which he or she relied. *See, e.g., Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 421 (Ala. 1997). Rather, the party claiming fraud must also demonstrate that his or her reliance on the misrepresentation was reasonable. *Wright Therapy Equip., LLC v. Blue Cross & Blue Shield of Alabama*, 991 So. 2d 701, 706 (Ala. 2008) ("This Court has stated that 'fraudulent-inducement claim[s] [are] governed by the "reasonable-reliance" standard.'" (citation omitted)).

Page 13 of 32

Under the reasonable-reliance standard, this Court has repeatedly affirmed that "a plaintiff who is capable of reading documents, but who does not read them or investigate facts that should provoke inquiry, has not reasonably relied upon a defendant's oral representations that contradict the written terms in the documents." *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1208 (Ala. 2008). As this Court explained in *Alfa Life Insurance Corp. v. Colza*, 159 So. 3d 1240, 1252 (Ala. 2014),

> [w]e do not think it unreasonable to conclude as a matter of law that, in this day and age, any adult of sound mind capable of executing a contract necessarily has a conscious appreciation of the risk associated with ignoring documents containing essential terms and conditions related to the transaction that is the subject of the contract.

Reasonable reliance is an element of a fraud claim. This Court has repeatedly held, as a matter of law, that evidence of reasonable reliance is lacking when a plaintiff fails to read documents that contradict the alleged misrepresentations. *Alfa Life Ins. Corp.*, 159 So. 3d at 1254-55; *Foremost Ins. Co.*, 693 So. 2d at 421; *Brushwitz v. Ezell*, 757 So. 2d 423, 430 (Ala. 2000); *Syx v. Midfield Volkswagen, Inc.*, 518 So. 2d 94, 98 (Ala. 1987).

. . .

The duty-to-read rule places a duty on <u>the signee</u> to read a contract before signing it, rather than creating some duty on the defendant. *Alfa Life Ins. Corp. v. Reese*, 185 So. 3d 1091, 1104 (Ala. 2015). This Court's prior decisions have repeatedly affirmed "the strict duty of a party to read the documents he or she is provided in connection with a transaction -- a duty that is limited only by the extremely narrow grounds set forth in *Potter v. First Real Estate Co.*, 844 So. 2d 540 (Ala. 2002)." *Colza*, 159 So. 3d at 1255. Under those extremely narrow grounds, "the duty-to-read rule may be avoided when . . . there are special circumstances or a special relationship between the parties or the plaintiff suffers from a disability rendering him or her unable to discern the contents of the document." *Reese*, 185 So. 3d at 1104 (citing *Potter v. First Real Estate Co.*, 844 So. 2d 540, 548-51 (Ala. 2002)).

*Brickhouse Cap., LLC v. Coastal Cryo AL, LLC*, 393 So. 3d 467, 473-74, 476-77 (Ala. 2023).

The Supreme Court of Alabama summarized *Potter* as follows:

In *Potter v. First Real Estate Co.,* 844 So.2d 540 (Ala.2002), the plaintiffs' real-estate agent told them that she represented them as buyers as much as she represented the sellers of the property the plaintiffs were purchasing. Nevertheless, when she was asked whether the property being purchased was in a flood plain, the agent stated that it was not, showing the plaintiffs an almost illegible survey. The sales contract stated that the property was not in a flood plain. At the closing, the plaintiffs were provided with another copy of the survey, and the agent again

assured them that the property was not in a flood plain, contrary to what appeared in a document presented at closing. Under those circumstances, we concluded that there was evidence of a special relationship between the plaintiffs and their acknowledged real-estate agent, together with evidence indicating that the agent had employed an artifice at the closing that lulled the plaintiffs into a false sense of security as to the contents of a document the plaintiffs were unable to read. We reversed the summary judgment in favor of the real-estate agent and her company.

*Smith*, 5 So. 3d at 1210.

The Supreme Court of Alabama in *Potter*, when it found there was a special relationship between the plaintiffs and their real-estate agent, noted: (1) the real-estate agent told one of the plaintiffs she "represented [the plaintiffs] 'as much as she represented the seller;'" (2) an agency agreement that was prepared by the agent's company, and executed by the agent and one of the plaintiffs, stated "[b]roker will not represent the interests of one party to the exclusion or detriment of the interest of the other party;" and (3) the agency agreement stated "[b]roker in its capacity as Limited Consensual Dual Agency, will disclose to both Seller and Buyer all facts and information which Broker believes are material or which might affect Seller's or Buyer's decisions with respect to this transactions." 844 So. 2d at 550-51.

Here, MWIS cites *Potter* to support its argument that there was a special relationship between it and the Mahorsky Parties such that MWIS was excused from the duty to read the indemnity agreements and could reasonably rely on the Mahorsky Parties' oral representations, which are not found in the agreements. Based on the evidence that has been presented, MWIS has not shown that the Mahorsky Parties agreed to perform any special duties, as contemplated in *Potter*. While MWIS seemingly looked to the Mahorsky Parties as subject matter experts in regard to bonding, indemnity, and surety, and believed they were looking out for its best interests, a special relationship that would impose certain duties on the Mahorsky Parties could not be unilaterally created by MWIS' desire for such, including a duty to disclose Cueto's financial

Page 15 of 32

condition.    Accordingly, MWIS has not proven its affirmative defense of fraud to avoid performance under the indemnity agreements.

### b.    Consideration

MWIS argues there was a lack of consideration for the Granger Lake bond indemnity agreement and a failure of consideration as to both indemnity agreements.  Doc. 133 at 38-43.  The Court will first address MWIS' lack-of-consideration argument then its failure-of-consideration argument.

### i.    Lack of Consideration

MWIS argues the Granger Lake bond is not supported by valid consideration because Aegis executed the Granger Lake bond on October 7, 2019, which was three (3) weeks before Jones executed the agreement on October 28, 2019, and such would be considered past consideration and would not support an enforceable contract.  Doc. 133 at 38-41.  Further, MWIS argues the Granger Lake contract was for a specific bond that was issued before MWIS signed the related indemnity agreement and no other bonds were issue for that project.  *Id.* at 41.  MWIS argues, despite the portion of the Granger Lake contract that states consideration was provided because Aegis would refrain from canceling the related bond, Aegis could not unilaterally cancel it and there is no relevant law that would allow it to do so.  *Id.* at 41-42.  MWIS clarifies it limits its lack-of-valid-consideration argument to the Granger Lake bond indemnity agreement.  Doc. 181 at 8 n.4.

In response, Aegis argues MWIS agreed the consideration was for Aegis to issue the bonds on behalf of Cueto.  Doc. 175 at 2-6. Specifically, Aegis directs the Court's attention to the language of the indemnity agreements, which state in relevant part:

> The Principal and Indemnitors understand that the Surety expressly requires the
> execution and delivery of this Agreement as part of the consideration for either

issuing or from refraining from canceling such Bonds either now or in the future. The Principal and the Indemnitors have substantial, material, or beneficial interest in obtaining, renewing, continuing, or substituting such Bonds.

. . .

In consideration of the foregoing, the promises set furth herein, and other good and valuable consideration, the receipt and sufficiency of which is expressly acknowledge by the undersigned, the Principal and the Indemnitors . . . hereby covenant and agree with the Surety as follows[.]

Doc. 1-1 at 2; Doc. 1-2 at 2.

Further, Aegis directs the Court's attention to the language of a separate "Resolution Authorizing Execution of Indemnity" that was a part of the indemnity agreements and separately signed by Jones, which read in relevant part:

Whereas MW Industrial Services, Inc. is materially interested in having certain surety bonds or undertakings issued for Cueto Consulting & Construction, LLC, as Principal, and for which it has applied to Aegis Security Insurance Company ("Surety") and may from time to time in the future make application to Surety for additional bond(s) or undertaking(s); and

WHEREAS, the Surety is willing to execute as Surety such bond(s) or undertaking(s) upon the written indemnity of MW Industrial Services, Inc., it is therefore:

RESOLVED that the officers authorized to execute documents on behalf of MW Industrial Services, Inc., be and they hereby are authorized and empowered to execute any indemnity agreement(s) . . . requested by the Surety as consideration for the execution by it of any bond(s) or undertaking(s) on behalf of the above-named Principal . . . and to execute any other or further agreements relating to such bond(s) or undertaking(s) or collateral that may have been deposited with the Surety in connection therewith . . . .

Doc. 1-1 at 13; Doc. 1-2 at 13.  As to the timing of when the bonds were issued, Aegis argues the language of the indemnity agreements addresses the issue:

23.    General Provisions

(a)    This Agreement applies to all Bonds executed or procured by the Surety for the Principal or the Indemnitors . . . whether executed or issued prior or subsequent to the execution of this Agreement.

. . .

> (e)    Bonds Executed Prior to Agreement.   The Principal and Indemnitors expressly recognize and covenant that this Agreement is a continuing obligation applying to and indemnifying the Surety as to any and all Bonds . . . heretofore and hereafter executed by Surety on behalf of Principal . . . until this Agreement shall be terminated by Principal and Indemnitors in the manner herein provided.

Doc. 124-1 at 7; Doc. 124-2 at 7.

> It is true that when someone not a party to the original transaction signs an instrument as guarantor after the original contract has been duly executed and delivered, without agreement at the time of the execution of the original contract that additional security would be furnished, he is entering a new and independent contract; and, to be binding, this agreement must be supported by consideration, independent of the original contract. *Clark v. McGinn*, 268 Ala. 252, 255, 105 So. 2d 668, 671 (1958).

> When dealing with a guarantee of a pre-existing debt, consideration is essential to sustain the obligation. *Zadek v. Forcheimer*, 16 Ala. App. 347, 348, 77 So. 941 (1918).

*Medley v. SouthTrust Bank of the Quad Cities*, 500 So. 2d 1075, 1078 (Ala. 1986); *see also Phillips Brokerage v. Professional Personnel Consultants*, 517 So. 2d 1, at 2-3 (Ala. Civ. App. 1987) ("A past consideration is not sufficient to support a contract, especially where the benefit which was derived therefrom was enjoyed by a third person [ ] rather than the promisor [ ].  Where a debt was already in existence, a second promisor's oral promise to the creditor to pay the existing debt of the original debtor is not enforceable unless there is a new and different consideration which is beneficial to the second promisor." (citations and internal citation omitted)).

> It is a well-settled general rule that consideration is an essential element of, and is necessary to the enforceability or validity of, a contract. 17A AM. JUR. 2d *Contracts* § 117 (1991).  It is generally stated that in order to constitute consideration for a promise, there must have been an act, a forbearance, a detriment, or a destruction of a legal right, or a return promise, bargained for and given in exchange for the promise. *Smoyer v. Birmingham Area Chamber of Commerce*, 517 So. 2d 585 (Ala.1987); 17A AM. JUR. 2d, *supra*, § 113.

*Kelsoe v. Int'l Wood Prods., Inc.*, 588 So. 2d 877, 878 (Ala. 1991).

The indemnity agreement for the Granger Lake Project bond reads, "The Principal and Indemnitors understand that the Surety expressly requires the execution and delivery of this Agreement as part of the consideration for either issuing or from refraining from canceling such Bonds, either now or in the future." Doc. 124-2 at 2. Here, the Granger Lake Project bond was issued before the corresponding indemnity agreement was executed. While the language of the indemnity agreement speaks of the possibility that bonds may be issued in the future, the Granger Lake Project indemnity agreement was for a specific bond, "Job Specific GIA for Bond No. B10 037 128," and no other bonds were ever issued for the project. *Id.*

Under the relevant sections of the Miller Act, 40 U.S.C. §§ 3131 – 34, Aegis was bound to pay any claims against the bond after they were issued without a third-party indemnitor. *See U.S. ex rel. Sherman v. Carter*, 353 U.S. 210, 216-17 (1957) ("The Miller Act represents a congressional effort to protect persons supplying labor and material for the construction of federal public buildings in lieu of the protection they might receive under state statutes with respect to the construction of nonfederal buildings. The essence of its policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material. Thus the Act provides a broad but not unlimited protection."); *see also U.S. ex rel Pertun Constr. Co. v. Harvesters Grp., Inc.*, 918 F.2d 915, 917-18 (11th Cir. 1990) ("The purpose of a Miller Act payment bond is to protect subcontractors and suppliers who provide labor and material for a federal project, because federally owned lands or buildings are exempt from the liens that would normally secure these parties' rights under state law." (citation omitted)). Whether, as MWIS contends, the Miller Act effectively prohibited Aegis from cancelling the bond is unclear, but Aegis' corporate representative, Russell Fuller, indicated the bonds could not be rescinded

Page 19 of 32

once they were issued:

> Q:    What would have happened to the bonds if MW[IS] just decided not
> to sign that Cross-Indemnity Agreement?
>
> A:    Well, if the bonds are issued and in effect, then that's, they run to
> the Government here, so that bond is in effect, no matter what.
>
> Q:    And Aegis would have just had to rely on Cueto as Indemnitor on
> the project?
>
> A:    If you're saying if there was no Indemnity Agreement from - -
>
> Q:    MW[IS].
>
> A:    - - MW at all, yes, that's true.
>
> Q:    And so Aegis could not rescind the bonds that it had already issued;
> is that correct?
>
> A:    Yes.    Because the Owner is kind of a innocent, they are a
> beneficiary, the third-party beneficiary, I guess.
> That's our problem, it's not their problem.

Doc. 156-1 at 38.

Since the Granger Lake Project indemnity agreement was for a specific bond that was issued before MWIS executed it and Aegis was not able to cancel the bond, the purported consideration stated in the agreement-Aegis would issue or refrain from cancelling the bond-does not appear to the Court to be a reciprocal promise of an act that could be performed by Aegis to constitute consideration, such that the agreement was gratuitous in nature.  *See* 1 ALA. PATTERN JURY INSTR. CIV. 11.04 (4th ed.) ("Consideration for a contract is: anything of value promised or received; or [d]oing or promising to do something which one has a right to do; or [p]romising not to do something which one has a right to do." (internal parenthetical marks omitted)).  Accordingly, the Granger Lake Project indemnity agreement fails for lack of consideration.

However, Aegis argues, in cases in which similar indemnity language is interpreted, the

relevant Courts rejected lack of consideration arguments because of belatedly executed indemnity agreements. Doc. 175 at 7. Aegis cites *Engbrock v. Federal Insurance Co.*, 370 F.2d 784 (5th Cir. 1967)[1], to support its argument. In *Engbrock*, plaintiff contended "the indemnity agreement fail[ed] for lack of consideration because he signed the agreement four months after the bonds had been issued." *Id.* at 787. The Fifth Circuit summarized:

> The trial judge recognized this contention would have force if the signing of the agreement had constituted a new promise by Engbrock. But, to the contrary, the judge found that prior to the execution of the bonds . . . Engbrock had promised orally to execute the indemnity agreement before or contemporaneously with the execution of the bonds. This finding [was] supported by ample evidence.

*Id.* The Fifth Circuit found "the execution of the indemnity agreement [was] in pursuance and consummation of a prior arrangement between the parties, and it is not necessary that the written promise carrying into effect the prior oral promise to execute the writing be supported by new or additional consideration." *Id.* (citations omitted).

Aegis argues the parties agreed to execute the indemnity agreements before they were actually executed such that new or additional consideration would not be necessary to make the agreement enforceable. Doc. 175 at 7-9. Aegis cites to certain emails to show there was an agreement for MWIS to execute the indemnity agreements. *Id.* at 9.

In an email from Bingaman to a representative of Cueto and Dollar that was sent on October 8, 2019, Bingaman wrote:

> Here's the GIA and Resolution Attached.
>
> . . .
>
> Attached is the Job Specific General Indemnity Agreement for the Granger Lake Office Complex. Jay, if you could, forward to Tiffanie.

---

[1] The Eleventh Circuit has adopted as binding precedent the decisions of the Fifth Circuit that were decided prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

. . .

Tiffanie, I have also attached the Corporate Resolution for MW.  Please sign and have this notarized.

Once completed, please email the Indemnity and the Resolution back to me for review.  If you have any questions, please contact me.

Doc. 175-1 at 5-6.

In an email from Bingaman to Jones that was sent on October 23, 2019, Bingaman wrote:

Good afternoon Tiffanie.

My name is Jesse Bingaman with Mahorsky Group.  I have been working with Jay Dollar on a few opportunities with a client of ours, Cueto Consulting & Construction.  There is an indemnity agreement for a project with the Fort Worth Army Corp of Engineers that should have been received by your office last week.  We need you to complete the GIA and the attached corporate resolution in order to release the bond for this project.  Below are directions for the GIA.  Please give me a call on my cell if you have any questions [ ].

*Id.* at 2.

In an email from Dollar to Jones that was sent on October 24, 2019, Dollar wrote:

Tiffanie,

You should have both original copies of the cross indemnity agreement from Andrew Cueto.  Could you get those signed and back to Andrew today?  Jesse with the Mahorsky group [sic] would like the documents scanned and sent to him ASAP so he can execute the bond to [Cueto].  (The cross indemnity does NOT ties MW to any bond or monetary obligation.  The agreement gives us first right to all work when the opportunity arises.  We did confirm this with Scott)/. Call me with any questions.

*Id.* at 4.

Jones forwarded Dollar's email to Landers on October 24, 2019, and asked, "Do I have your go ahead on this?" to which Landers responded on the same date, "Yes.  This is fine to sign.  Thx." *Id.* at 4.

Aegis also cites the affidavit of Bryan Morse ("Morse"), who in 2019 was a contract surety manager with Aegis.  Doc. 175 at 9; Doc. 175-2 at 2.  Morse states:

> Based upon the financial statements provided by MWIS and Cueto Consulting, I recommended that Aegis issue the bonds on behalf of Cueto Consulting, with express understanding that MWIS would also execute our Standard Agreement of Indemnity and cross-indemnify Aegis with respect to both projects. . . . The bonding for the Cueto projects would not have been approved or issued without the MWIS Agreement of Indemnity.

Doc. 175-2 at 3.

MWIS cites to an email from Dollar to a representative of Cueto that was sent on October 8, 2019, shortly after Bingaman's email that was sent on the same date and quoted above, in which Dollar states:

> Andrew,
>
> Good morning!  I hope all is well and you had a great weekend.  I wanted to touch base with you and make sure we are all on the same page regarding this project. We are under the understanding that you have the project awarded to you and you need help from MW[IS] getting the in place and executing the project, is this correct?  I know we have the subcontractor in place to perform the work so how do you see the project going?  Let me know what percentage you would like to keep on your end and what percentage MW[IS] will get after the bond fees.  Mike and I will be discussing with our owners this afternoon and I just want to make sure we are all on the same page my friend.  We look forward to working with you guys on this and many other opportunities.

Doc. 176-5 at 38.  MWIS argues this email shows MWIS was not committed to serve as an indemnitor before the Granger Lake Project bond was issued.  Doc. 181 at 11.

Having reviewed the parties' evidentiary submissions of the communications in regard to whether MWIS agreed to act as an indemnitor for the Granger Lake Project bond before it was issued, the Court finds the evidence is insufficient to establish such an agreement.

### ii.    Failure of Consideration

MWIS argues it did not receive anything it was promised from the indemnity agreements.

Doc. 133 at 38-43.  Since the Court found there was a lack of consideration for the Granger Lake bond indemnity agreement, it will not address MWIS' failure-of-consideration argument as to it, and will only address the argument as to the Fort Hood Project bond indemnity agreement.

> Generally, the term "failure of consideration" is described as "the neglect, refusal and failure of one of the contracting parties to do, perform, or furnish, after making and entering into the contract, the consideration in substance and in fact agreed on." 17 C.J.S. CONTRACTS § 129 (1963).  In addition, a failure of consideration is "predicated on the happening of events which materially change the rights of the parties, which events were not within their contemplation at the time of the execution of the contract."  *Id.*
>
> Typically, a total failure of consideration is used as an excuse for nonperformance of a contract.  17A AM. JUR. 2D CONTRACTS § 670 (1991).
>
> . . .
>
> In effect, a failure of consideration is the failure to perform a promise contained in the agreement, and it is much like a breach. 17A Am.Jur.2d Contracts § 670 (1991).

*Lemaster v. Dutton*, 694 So. 2d 1360, 1366 (Ala. Civ. App. 1996).

Unlike the Granger Lake bond indemnity agreement, the Fort Hood Project bond indemnity agreement was for the contract itself, specifically "Contract W9115119D0005 and All Associated Task Orders," (Doc. 124-1 at 2), which MWIS states "allowed Aegis to issue additional bonds on it, such as for specific tasks[, w]hich Aegis did," (Doc. 133 at 41 n.35).  The Fort Hood Project bond indemnity agreement recites the same consideration provision as the Granger Lake Project bond agreement, "The Principal and Indemnitors understand that the Surety expressly requires the execution and delivery of this Agreement as part of the consideration for either issuing or from refraining from canceling such Bonds, either now or in the future."  *Compare* Doc. 124-1 at 2 *with* Doc. 124-2 at 2.  MWIS admits that bonds were issued for specific tasks pursuant to the Fort Hood Project contract, which occurred after the related indemnity agreement was executed by MWIS. Therefore, MWIS' failure-of-consideration argument fails.

## 2.    Irreparable Injury

"An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987) (citing *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983).

> The key word in this consideration is *irreparable*.  Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974).

To show Aegis has suffered irreparable injury, it cites to certain provisions in "Section 3(b)" of the indemnity agreements, which read in relevant part:

> (b) **Right to Deposit of Collateral** – The Principal and Indemnitors shall make payment to the Surety immediately upon demand by the Surety.  The Surety may demand payment in an amount: (i) equal to the amount of any reserve set by the Surety, or (ii) equal to such amount as the Surety, in its sole judgment, shall deem sufficient to protect it from loss. . . . The Principal and Indemnitors shall be entitled to the refund of any unused portion of the deposit upon termination of the liability of the Surety on all Bonds and the performance by the Principal and Indemnitors of all obligations to the Surety under the terms of this Agreement. . . . The Principal and Indemnitors acknowledge that the failure of the Principal and Indemnitors to deposit with the Surety, immediately upon demand, the sum demanded by the Surety as collateral security shall cause irreparable harm to the Surety for which the Surety has no adequate remedy at law.  The Principal and Indemnitors agree that the Surety shall be entitled to injunctive relief for specific performance of the obligation of Principal and Indemnitors to deposit with the Surety the sum demanded as collateral security and hereby waive any claims or defenses to the contrary.

Doc. 124-1 at 3; Doc. 124-2 at 3.

Aegis argues Jones confirmed in her deposition that she executed the indemnity agreements that contain the above cited provision, and therefore, the indemnity agreement should be performed as requested by Aegis.  Doc. 124 at 5.

The Court in *Dragon Jade International, Ltd. v. Ultroid, LLC*, was confronted with a

Page 25 of 32

similar argument to Aegis's that a contractual provision creates a presumption of irreparable harm or compels a court to find such and, after a review of relevant cases, could not find support for the argument. Civ. Act. No. 8:17-cv-2422-T-27TBM, 2018 U.S. Dist. LEXIS 66715, at *10-11, 2018 WL 1833169, at *4 (M.D. Fla. Jan. 30, 2018) (hereinafter, "*Dragon Jade*") (citing *Baker's Aid, a Div. of M. Raubvogel Co., Inc. v. Hussmann Foodservice Co.*, 820 F.2d 13, 16 (2d Cir. 1987); *Erving v. Va. Squires Basketball Club*, 468 F.2d 1064, 1067 (2d Cir. 1972); *Agilsys, Inc. v. Hall*, 258 F. Supp. 3d 1331, 1358, n.10 (N.D. Ga. 2017); *First Health Grp. Corp. v. Nat'l Prescription Adm'rs, Inc.*, 155 F. Supp. 2d 194, 235 (M.D. Pa. 2001); *Firemen's Ins Co. of Newark, N.J. v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 199); *Anago Franchising, Inc. v. CHMI, Inc.*, Civ. Act. No. 09-60713-CIV, 2009 U.S. Dist. LEXIS 123352, at *30-31, 2009 WL 5176548, at *11 (S.D. Fla Dec. 21, 2009)). The *Dragon Jade* Court noted the plaintiff did not cite authority to support its argument and found such contractual provisions were relevant but did not control the issue of whether there is irreparable harm. 2018 U.S. Dist. LEXIS 66715, at *11, 2018 WL 1833169, at *4. This Court joins in the finding of the *Dragon Jade* Court, and therefore, Aegis must show irreparable harm beyond the contractual provision that states MWIS acknowledges its failure to deposit collateral security causes irreparable harm.

However, Aegis further argues it will suffer irreparable harm because it will not receive the benefit of the bargain between it and MWIS. Specifically, in the indemnity agreements, MWIS agreed Aegis may demand payment either "equal to the amount of any reserve set by [Aegis]" or "equal to such amount as [Aegis], in its sole judgment, shall deem sufficient to protect it from loss." Doc. 124-1 at 3; Doc. 124-2 at 3. MWIS's payment would provide Aegis collateral security, and many courts have recognized a surety is entitled to specific performance of collateral security agreements. *See Int'l Fid. Ins. Co. v. Talbot Constr., Inc.*, Civ. Act. No. 1:15-CV-3969-LMM,

2016 U.S. Dist. LEXIS 195304, at *14-*22, 2016 WL 8814367, at *6-*8 (N.D. Ga. Apr. 13, 2016); *Travelers Cas. & Sur. Co. of Am. v. Indus. Com. Structures, Inc.*, Civ. Act. No. 6:12-cv-1294-Orl-28DAB, 2012 U.S. Dist. LEXIS 145229, at *6-*9, 2012 WL 4792906, at *2-*3 (M.D. Fla. Oct. 9, 2012); *Hanover Ins. Co. v. Holley Constr. Co. & Assocs., Inc.*, Civ. Act. No. 4:11-CV-41(CDL), 2012 U.S. Dist. LEXIS 14526, at 16, 2012 WL 398135, at *6 (M.D. Ga. Feb. 7, 2012); *Int'l Fid. Ins. Co. v. Waterfront Grp. NC, LLC*, Civ. Act. No. 3:11-cv-00116-W, 2011 U.S. Dist. LEXIS 1163112011, at *10-*13, 2011 WL 4715155, at *4-*5 (W.D. N.C. Oct. 6, 2011); *Devs. Sur. & Indem. Co. v. Elec. Serv. & Repair, Inc.*, Civ. Act. No. 09-21678-CIV, 2009 U.S. Dist. LEXIS 112955, at *2-*5, 2009 WL 3831437, at *1-*2 (S.D. Fla. Nov. 16, 2009). And, in the context of a request for a preliminary injunction for specific performance of a collateral security agreement, many courts have found irreparable injury where the surety continues to be exposed to claims against the bonds. *Phila. Indem. Ins. Co. v. Therma Seal Roof Sys., LLC*, Civ. Act. No. 21-80306-CIV-MARRA, 2022 U.S. Dist. LEXIS 95297, at *11-14, *2022 WL 1664183, at *4-*5 (finding irreparable harm where the plaintiff made a collateral security demand while claims were outstanding against the bonds); *Frankenmuth Mut. Ins. Co. v. Pac Comm, Inc.*, Civ. Act. No. 1:20-cv-24064-LENARD/LOUIS, 2021 WL 1204975, at *5-*6 (S.D. Fla. Mar. 19, 2021) ("Though not dispositive, it warrants noting that protection against the risk of ongoing exposure like the kind Plaintiff faces now was the express purpose of the collateral security provision in the Indemnity Agreement, and to deny Plaintiff the right to collateral would be to deny it the benefit of its bargain under the contract."); *Guarantee Co. of N. Am. USA v. MIK, LLC*, Civ. Act. No. 1:18-cv-60825-UU, 2018 WL2018 WL 4208241, at *3 (S.D. Fla. June 26, 2018) ("Courts regularly hold that there is no adequate remedy at law for the lack of collateral security payments while claims are pending."); *SureTec Ins. Co. v. Eternity LLC*, Civ. Act. No. 1:18-cv-1247-ACA, 2018 U.S. Dist.

Page 27 of 32

LEXIS 194884, at *7-*8, 2018 WL 6001103, at *3 (N.D. Ala. Nov. 15, 2018) ("Therefore, damages available after trial and judgment, even if including costs and interest, are of little use to SureTec when it is responsible for investigation, defending, and paying claims on bonds in the present and this is true for losses that SureTec has already paid." (alterations adopted) (citation and internal quotation marks omitted)).

The procedural posture for the case at hand is awkward. Here, based on Aegis's interrogatory answers, which were sworn to on July 19, 2024, it did not "anticipate any additional claims relating to the Granger and Fort Hood Projects," (Doc. 132-19 at 11, 15), so Aegis is no longer exposed to future claims on the bonds and the amount of the claims against them are seemingly certain, based on its knowledge. Further, this matter was originally filed on April 27, 2023 (Doc. 1), and the instant motion for preliminary injunction was filed on March 28, 2025 (Doc. 123), approximately twenty-three (23) months after this action was initiated. In a letter that is dated June 20, 2022, Aegis demanded MWIS deposit the collateral, approximately thirty-three (33) months before the instant motion for preliminary injunction was filed. Doc. 124 at 5; Doc. 124-3.

> A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm. A preliminary injunction requires showing "imminent" irreparable harm. *Siegel* [*v. LePore*], 234 F.3d [1163,] 1176–77 [(11th Cir. 2000)] (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)). Indeed, the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits. *Cf. Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834, 68 L. Ed. 2d 175 (1981); *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1539 (11th Cir. 1989). For this reason, our sister circuits and district courts within this Circuit and elsewhere have found that a party's failure to act with speed or urgency in moving for a preliminary injunction necessarily undermines a finding of irreparable harm. *See, e.g., Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985); *Taylor v. Biglari*, 971 F.Supp.2d 847, 853 (S.D. Ind. 2013) (citing *Shaffer v. Globe Protection, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)); *Silber v. Barbara's Bakery, Inc.*, 950 F.Supp.2d 432, 439–40

(E.D.N.Y. 2013); *Hi–Tech Pharm., Inc. v. Herbal Health Prods., Inc.*, 311 F.Supp.2d 1353, 1357–58 (N.D. Ga. 2004); *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F.Supp.2d 1350, 1355–56 (S.D. Fla. 2002).

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

While Aegis does not anticipate there will be any more claims on the bonds and its delay to seek a preliminary injunction both weigh against the conclusion it will suffer imminent irreparable harm if the preliminary injunction it seeks is not granted, the numerous opinions in which courts have enforced specific performance of collateral security agreements on a motion for preliminary injunction and the lack of legal remedy for Aegis's equitable claim to collateralization weigh in favor of a finding of irreparable harm and outweigh the negative factors.

> [Ultimately, Aegis is] not simply an unsecured creditor of defendant[ ] seeking to freeze defendant['s] assets before judgment can be obtained.  [It] specifically bargained for a collateral security provision pursuant to which defendant[ ] contractually agreed to post collateral with the plaintiff in the event plaintiff establishes a reserve against losses and demands such amount from defendant[ ].

*SureTec Ins. Co.*, 2018 U.S. Dist. LEXIS 194884, at *7-*8, 2018 WL 6001103, at *3 (internal quotations marks omitted) (quoting *Int'l Fid. Ins. Co.*, 2016 U.S. Dist. LEXIS 195304, at *14-*22, 2016 WL 8814367, at *6-*8).

### 3.    Balance of Harm

Aegis argues MWIS will neither be prejudiced or harmed if it is required to deposit the collateral demand with the Court since MWIS' rights and claims would be preserved pending a final dispositions of its claims, and any harm to MWIS if the Court grants Aegis' request is outweighed by the threatened harm to Aegis that it will not be able to enforce its contractual rights under the indemnity agreements.  Doc. 124 at 8-9.

In response, MWIS argues it is a small, cash-intensive general contractor, and Jones, MWIS's CEO, states in her affidavit, "While MWIS has sufficient assets to satisfy a potential

judgment, placing $3.3 million of MWIS' funds in escrow pending the outcome of this lawsuit would put substantial strain on MWIS' ability to continue its normal business operations and risk causing the company significant harm." Doc. 132-45 at 3. Jones explains its business model as follows:

> MWIS' business is cash-intensive because it requires a large amount of available cash to operate because MWIS' funds are spent up-front given that it[s] projects are self-financed. Generally, MWIS pays for line items such as payroll, materials, equipment rentals, subcontractor invoices, overhead, and other expenses as a project proceeds. MWIS does not send monthly pay applications. We submit an invoice only at project completion (or, on very large projects, at completion of certain preset milestones), with payment arriving up to 60 days after. This means that there is a significant delay between MWIS outlaying its funds to pay its subcontractors and suppliers, completion of a project, and payment – with initial project investments coming even earlier. As a result, if MWIS makes a profit on a job, that profit comes long after MWIS expends its own money to pay for project construction. This requires MWIS to maintain a significant amount of cash to operate.

Doc. 132-45 at 3. MWIS argues courts have recognized potential bankruptcy or business failure heavily weighs against an injunction. Doc. 133 at 43 (citing *Am. Hosp. Supply Corp. v. Hosp Prods. Ltd.*, 780 F.2d 589, 598 (7th Cir. 1986); *Unisource Wordwide, Inc. v. S. Cent. Ala. Supply, LLC*, 199 F. Supp. 2d 1194, 1214 (M.D. Ala. 2001)).

> Specific performance of a collateral security provision is necessary "to protect three interests of the surety: the bargained-for benefit of collateral security, avoidance of present exposure to liability during pending litigation against indemnitors, and avoidance of risk that, should indemnitors become insolvent, the surety will be left as a general unsecured creditor, frustrating the purpose of the indemnity agreement."

*Argonaut Ins. Co. v. Summit Concrete, Inc.*, 647 F. Supp. 3d 1228 (N.D. Ala. 2022) (quoting *Talbot Constr., Inc.*, 2016 U.S. Dist. LEXIS 195304, at *16-*17, 2016 WL 8814367, at *7). While Jones indicates placing funds in escrow pending the outcome of this litigation would cause financial strain and risk harm to MWIS, she does not state such act would lead to potential bankruptcy or business failure as argued. In any case, the Court intends to only require MWIS to deposit funds

with the Court to cover the claims against the Ford Hood bonds, since the Court found the Granger Lake project bond indemnity agreement failed for lack of consideration, and MWIS indicated the majority of Aegis' requested collateral security deposit consisted of claims against the Granger Lake project bond. *Cf. U.S. v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1359 (11th Cir. 2019) ("The very nature of equitable power – the thing that distinguishes it from law – is its flexible and discretionary nature, its ability to respond to real-world practicalities, and its general aversion to rules that let bad actors capitalize on legal technicalities."). Therefore, the Court finds the threatened injury does not outweigh the harm that would result from the injunction.

### 4.    Public Interest

Finally, Aegis argues its requested injunction comports with the public interest to enforce contracts and maintain the solvency of surety companies that support public construction projects, interests that are upheld in *Argonaut Ins. Co.*, 647 F. Supp. 3d at 1234, and *SureTec Ins. Co.*, 2018 U.S. Dist. LEXIS 194884, at *9-*10, 2018 WL 6001103, at *3.

In response, MWIS argues Aegis is no longer in the surety business, so the public interest to ensure its solvency in that industry is not a factor that the Court should consider. Doc. 133 at 43.

The Court finds the enforcement of the collateral security provision in the Fort Hood Project bonds indemnity agreement is not adverse to the public interest.

## V.    CONCLUSION

Accordingly, the *Motion for Preliminary Injunction and for Specific Performance of Agreements of Indemnity for Deposit of Collateral by MWIS* (Doc. 124) is **GRANTED in part and DENIED in part**. The motion is **GRANTED** insofar as Plaintiff/Counterclaim Defendant Aegis Security Insurance Co. requests:

(1) Defendant/Counterclaim Plaintiff/Third-Party Plaintiff MW Industrial Services, Inc. deposit collateral, to be held by the Clerk of Court pending final disposition of the claims in this matter, in the amount of the total claims that were made against the bonds that were issued for the Fort Hood Project;

(2) Defendant/Counterclaim Plaintiff/Third-Party Plaintiff MW Industrial Services, Inc. provide a sworn accounting as to any and all assets owned or controlled by it within twenty (20) days following entry of this Memorandum Opinion and Order; and

(3) Pending Defendant/Counterclaim Plaintiff/Third-Party Plaintiff MW Industrial Services, Inc.'s deposit of collateral, it is **ORDERED, ENJOINED, AND RESTRAINED** from transferring any assets other than in the ordinary course of business, unless approved in advance by Plaintiff/Counterclaim Defendant Aegis Security Insurance Co.

Plaintiff/Counterclaim Defendant Aegis Security Insurance Co.'s granted relief is hereby **ORDERED**. Plaintiff/Counterclaim Defendant Aegis Security Insurance Co. additional requested relief is **DENIED**.

**DONE** and **ORDERED** this 31st day of March 2026.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE